UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> v.  ) <br> ) <br> KEVIN JEAN,  ) <br> ) <br> Defendant. ) <br> ) <br> ) | Criminal No. 19-40025-TSH |

**Findings and Order on Defendant's Omnibus Motion to
Suppress Intercepted Wire Communications and Physical Evidence (Document #209)**

**October 13, 2021**

### Introduction

The defendant Kevin Jean has moved to suppress from the introduction into evidence against him at trial intercepted wire communications, and physical evidence seized pursuant to a search warrant. He assigns as reason for the suppression of the search warrant that there was not sufficient probable cause for the search his residence/business at 105 Hamilton St in Worcester and that the information relied upon by the issuing Magistrate Judge was stale. For the reasons set forth below that motion is denied.[1]

---

[1] With respect to the Defendant's prayer for suppression of intercepted wire communications, I have previously ruled on an identical motion from Defendant Melendez and incorporate and adopt that finding here. That motion was denied on March 19, 2021 (See #275).

**Facts**

In July of 2018, Worcester police, and the ATF and the DEA began investigating defendant Junior Melendez and his associates, including Mr. Jean, for drug and firearm offenses. Mr. Melendez was known to the police after having been convicted of similar offenses in 2006 for which he served a lengthy (109 month) sentence. He was identified by the police as the leader of the Massachusetts chapter of the Almighty Vice Lords, a violent street gang. In September of 2018, the authorities obtained a warrant to search Mr. Melendez' Facebook records. In December of 2018, the authorities installed a pole camera in front of 26 Malvern Street in Worcester, Massachusetts which was an address associated with Mr. Melendez. On March of 2019, the government obtained authorization to intercept wire and electronic communications from Mr. Melendez' cell phone.

The defendant, Mr. Jean, works at and lives in the "Who's Next Barber Shop" located at 105 Hamilton St in Worcester. The affidavit in support of the search warrant for 105 Hamilton street details surveillance and numerous intercepted phone calls evidencing that the barber shop was a drug distribution center for the Melendez organization. On a March 14, 2019 telephone call between Melendez and Jean, Melendez told Jean that a third party was "gonna grab eight" and that that person was at the bank. Jean replied that he would "go straight to the shop" and Melendez asked if Jean "would see them for me if you want." Jean asked Melendez to instruct the third party to go to the shop which the affiant interpreted as a reference to the barbershop at 105 Hamilton Street. That same day Melindez spoke with an individual named Jack Sweeney and directed Sweeney to "call Kev, and go to Kev's, he's on his way to the shop now." Melendez also told Sweeney, "tell him too give it to you out of mine." Later that day Melendez called Jean and instructed him to "give Sweeney two." The affiant opined that Melendez instructed Sweeney to visit 105 Hamilton St to meet with Jean to acquire drugs and to give Sweeney drugs from his (Melendez') supply.

Four days later (on March 18th) Melendez called Jean and told him "I need them little things."  Jean asked Melendez if he had a key to the room where the little things were stored and when Melendez indicated that he did not, Jean told Melendez that he would "head down right now."  Again, the agent opined that little things refers to illegal narcotics stored at 105 Hamilton Street.

On April 1st 2019 Melendez again spoke with Jack Sweeney and instructed him to again meet him "by the shop." At 6:05 P.M. Sweeney called Melendez and Melindez said he was "at the shop." The affiant opined that Melendez directed Sweeney to 105 Hamilton St so that Melendez could provide drugs to Sweeney.  On April 14th,  Melendez called Jean and asked if he was at the shop.  When Jean told him that he was not,  Melendez told him that he needed money which Jean informed him was at the shop ("18 or 19 in the drop top drawer next to my bed"), and instructed Melendez to "take whatever you want."  The agent opined that this again demonstrated Melendez' use of 105 Hamilton as a distribution center for drugs.

 On May 6, 2019 Jean received drugs from Angel Cordova on behalf of Meléndez. Melendez and Cordova had spoken about Cordova bringing "five" which the agent opined was 500 grams of cocaine.  Melendez wanted "six" but Cordova indicated that he only had five.  Melendez told  Cordova to "bring it where you came last time" and that "his man"  would meet him.  Cordova informed Melendez that he was driving a Gray Dodge Charger.  Surveillance at 69 Cutler St in Worcester (the residence of co-defendant Juan Rodriquez) that day placed the Gray Dodge Charger at that address.  Surveillance observed Jean  leave 105 Hamilton Street and drive to 69 Cutler Street and approach the Gray Dodge Charger for a brief time and then go inside 69 Cutler Street.  The Gray Dodge Charger then left the area after only parking for approximately 3 minutes.

On May 7th, Melindez spoke with Carlos Richards who lived in New Hampshire. Melendez told Richards that someone would be driving "four" to Richards the next day. The affiant believed that reference to "four" was to 400 grams of cocaine. On May 8th, surveillance observed a Nissan Altima registered to Juan Rodriguez leave 69 Cutler St and arrive at 105 Hamilton Street, a male exited the Altima, entered Hamilton Street, left shortly thereafter carrying a black bag, reentered the Ultima and drive away. Later that afternoon Melendez called Jean and told him that he "was checking to make sure everything was good." Jean responded that he "had a little bit of a scary moment for four exits," and Melendez told him that he would see him upon his return in Worcester. at 5:17, Melendez called Jean who told him that he was just getting back to Worcester. The affiant believed that the above transaction involved Jean using Rodriguez' automobile to deliver 400 grams of cocaine to Richards in New Hampshire.

In addition to these incriminating telephonic interceptions, the affidavit recounts a confidential source who reported that he or she had been inside of 105 Hamilton Street on numerous occasions within the year prior to the warrant. The confidential source reported that he/she had observed that Melendez and Jean used 105 Hamilton St as a storage and distribution point for cocaine and firearms; that Jean resides in the back of the barbershop; that Melendez and Jean store narcotics inside a clothes dryer at the premises; and that he/she had seen firearms including three or four pistols at the address.

## Discussion

A search warrant may issue only if the affidavit in support of the warrant demonstrates that there is probable cause to believe that a particular person has committed a crime (also called the *Commission element),* and that the evidence related to the probable cause will be located at

the place to be searched (the *nexus element*).   *U.S. v. Vigeant*, 176 F. 3rd 565, 569  (1st. Cir. 1999),  *U.S. v. Zayas-Diaz*, 95 F. 3rd 105, 110 (1st. Cir. 1996).  With respect to the nexus element,  the issuing Magistrate Judge is to make a common sense decision based upon all of the information in the affidavit that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *U.S. v. Strother*, 318 F.3d 64, 67-68 (1st. Cir. 2003).  The first circuit counsels that an affidavit must be looked at using a practical, common sense approach and that the court should accord considerable deference to reasonable inferences.  I find that the affidavit in support of the search warrant application demonstrates overwhelming evidence that the premises at 105 Hamilton St were used as a center for the Melendez drug dealing enterprise and is supported by probable cause establishing both the nexus and commission elements.

The defendant also argues that the probable cause was stale because almost two months had a lapsed between the last intercepted phone call between Jean and Melendez on April 14, 2019 and the application for the search warrant on June 4th.  Drug conspiracies tend to last long periods of time, *U.S. v. Schafer*, 87 F. 3rd 562, 568 (1st.Cir. 1996).  "It is common ground that drug conspiracies tend to be ongoing operations rendering timely, information that might in other contexts, be regarded as stale." U.S. v. Zayas-Diaz, 95 F. 3rd 1, 5.  The affidavit in support of the search warrant details Jean's role in the drug conspiracy from March to May of 2019 with Jean's last involvement being on May 8th thus leaving a one month period between the latest evidence of drug activity and the application for the warrant.  I find that this one month delay does not implicates staleness issues

## Conclusion

For the reasons set forth above, the Defendant's motion to suppress is denied.

/s/Timothy S. Hillman
TIMOTHY S. HILLMAN
U.S. DISTRICT JUDGE
