UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                            )<br>)<br>JUNIOR MELENDEZ,                           )<br>JUAN RODRIGUEZ, and                     )<br>KEVIN JEAN,                                         )<br>)<br>    Defendants.                           ) | Crim. No. 19-cr-40025-TSH |

**GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS'
POST-VERDICT MOTIONS FOR ACQUITTAL**

The United States of America, by and through its attorneys, United States Attorney Rachael S. Rollins and Assistant United States Attorneys Greg A. Friedholm and Lauren A. Graber, submits this omnibus opposition to the post-verdict motions for acquittal pursuant to Rule 29 filed by defendants Junior Melendez (ECF #518), Juan Rodriguez (ECF #523), and Kevin Jean (ECF #511, 513, 517). As detailed below, over the course of two weeks, the jury heard ample evidence to convict all three men of conspiring to possess with intent to distribute and to distribute 500 grams or more of cocaine. For that reason, the Court should summarily deny the motions and proceed to sentencing.

**PROCEDURAL HISTORY**

On July 2, 2019, a federal grand jury indicted the three defendants, along with co-defendants Angel Cordova, Carlos Richards and Antoine Mack, with conspiracy to possess with intent to distribute and to distribute 500 grams or more of cocaine.[1] These three defendants – Melendez, Rodriguez and Jean – invoked their right to trial by jury.

---

[1] To date, Richards has evaded arrest. Mack and Cordova pled guilty before trial.

Beginning on March 14, 2022, the Court held a jury trial on the indictment. The government presented evidence against the defendants over the course of approximately nine trial days that included but was not limited to:

- Testimony by ATF Special Agent Anthony Ventetuolo, the case agent for the wiretap investigation. Agent Ventetuolo's testimony included the presentation of approximately 100 phone calls and text messages involving cellphones used by Melendez and Rodriguez that were intercepted pursuant to Court authorization;

- Testimony by numerous ATF agents and Worcester police officers regarding physical surveillance of the three defendants conducted in support of the wiretap investigation;

- Testimony by a New Hampshire state trooper who stopped co-defendant Carlos Richards immediately after he had exited Melendez's residence and seized over 300 grams of cocaine from Richards' vehicle; and

- Testimony by ATF agents and Worcester police officers who participated in the execution of search warrants of defendant's cellphones and residences.

On March 30, 2021, the jury returned a verdict of guilty against each defendant.

On April 6, 2022, Kevin Jean filed a motion for acquittal (ECF #511), and supplemented that motion on April 11 (ECF #513) and April 12 (ECF #517). On April 13, 2022, both Melendez (ECF #518)[2] and Rodriguez (ECF #523)[3] filed post-verdict motions for acquittal.

**ARGUMENT**

A.  <u>Legal Standard</u>

"The standard of review for a judgment of acquittal notwithstanding a verdict is identical to the test employed to measure the sufficiency of evidence supporting a guilty verdict." *United States v. McNatt*, 813 F.2d 499, 502 (1st Cir. 1987)). The test is whether the evidence – taken in

---

[2] Melendez filed a motion for directed verdict at the close of the government's case-in-chief (ECF #488). The Court denied that motion on April 5, 2022 (ECF #509).

[3] Rodriguez also filed a motion for directed verdict at the close of the government's case-in-chief (ECF #489). The Court denied that motion on April 5, 2022 (ECF #508).

the light most favorable to the government and when considered as a whole with all plausible inferences drawn therefrom – would allow a rational trier of fact to have found guilt beyond a reasonable doubt. *United States v. Scott,* 564 F.3d 34, 39 (1st Cir. 2009); *United States v. Moran*, 312 F.3d 480, 487 (1st Cir. 2002). The Court should not "lightly overturn[] a jury verdict on the ground that the jury lacked sufficient evidence, for the jury's central role and competence is to weigh the evidence and find the facts." *United States v. Moran*, 984 F.2d 1299, 1302 (1st Cir. 1993). Accordingly, a guilty verdict should not be overturned "unless, viewing the evidence in the light most favorable to the prosecution, no reasonable jury could have rendered [it]." *United States v. Paret-Ruiz*, 567 F.3d 1, 5 (1st Cir. 2009) (quoting *United States v. Nelson Rodriguez*, 319 F.3d 12, 27 (1st Cir. 2003)). In short, a defendant challenging a sufficiency of the evidence undertakes a "formidable" burden. *See United States v. Lipscomb*, 539 F.3d 32, 40 (1st Cir. 2008).

Importantly, it is not the trial court's function to reweigh evidence or make credibility determinations anew. *Burks v. United States*, 437 U.S. 1, 16 (1978); *United States v. Mena-Nobles*, 4 F.3d 1026, 1031 (1st Cir. 1993). Instead, the issue is whether "any reasonable jury could find all the elements of the crime [proven] beyond a reasonable doubt." *United States v. Santos-Soto,* 799 F.3d 49, 57 (1st Cir. 2015), quoting *United States v. Azubike,* 564 F.3d 59, 64 (1st Cir. 2009). The Court's responsibility is to "evaluate the sum of all the evidence and inferences drawn therefrom in the light most favorable to the government, resolve all credibility disputes in its favor, and determine whether that sum is enough for any reasonable jury to find all the elements of the crime proven beyond a reasonable doubt, even if the individual pieces of evidence are not enough when viewed in isolation." *United States v. Acevedo-Hernandez,* 898 F.3d 150, 161 (1st Cir. 2018) (internal quotations and citations omitted). "The verdict must

stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt." *United States v. Appalon,* 695 F.3d 44, 55 (1st Cir. 2012), quoting *United States v. Rodriguez-Velez,* 597 F.3d 32, 39 (1st Cir. 2010). "The evidence may be entirely circumstantial, and need not exclude every hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence." *United States v. Scharon,* 187 F.3d 17, 21 (1st Cir. 1999).

      B.      <u>Elements of the Crime For Which the Defendants Were Convicted</u>

To convict Melendez, Rodriguez and Jean on the single count of conspiracy, the government had to show that each defendant entered into an agreement with at least one other person to possess with intent to distribute or to distribute 500 grams or more of cocaine. *Moran,* 984 F.3d at 1300; *United States v. Gomes*, 376 F.3d 42, 44-45 (1st Cir. 2004). The government bore the burden of introducing sufficient evidence to show "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." *United States v. Gomez-Pabon,* 911 F.2d 847, 852 (1st Cir. 1990).

The agreement "need not be express so long as it can be plausibly inferred from the defendants' words and actions and the interdependence of activities and persons involved." *United States v. Boylan*, 898 F.2d 230, 241 (1st Cir. 1990). Proof of the defendant's agreement, knowledge, and participation in the conspiracy may be through either direct or circumstantial evidence. *Id.* at 242. "Such evidence may include the defendant's acts that furthered the conspiracy's purposes." *Acevedo-Hernandez,* 898 F.3d at 161 (quoting *United States v. McDonough,* 727 F.3d 143, 156 (1st Cir. 2013)). Importantly, while the government must establish that a conspiracy existed and that the defendant knowingly joined that conspiracy, the government need not establish (a) that a defendant knew of or had contact with all of the

other members of the conspiracy, (b) that he knew all of the details of the conspiracy, or (c) that he participated in every act in furtherance of the conspiracy. *Acevedo-Hernandez,* 898 F.3d at 161-62.

    C.    <u>The Court Should Deny Junior Melendez's Motion Because the Jury Heard Sufficient Evidence Regarding Melendez's Participation in the Conspiracy</u>

In his motion, Melendez baldly asserts that no rational trier of fact could find him guilty beyond a reasonable doubt based on the "record evidence" in this case. To the contrary, over the nine days of trial testimony, the jury heard overwhelming evidence identifying Melendez as the ringleader of the cocaine acquisition and distribution conspiracy. To that effect, the evidence introduced included but was not limited to the following:[4]

- On April 2, 2019, Melendez distributed over 20 grams of crack cocaine to Lujan Burgos at 26 Malvern Road. That distribution was coordinated through a series of text messages (Exhibit 113), and the meeting between Melendez and Burgos was captured on pole camera video (Exhibits 114-1 and 114-2). Worcester Police Office Trevis Coleman testified regarding his stop of Burgos after he left 26 Malvern Road and the seizure of cocaine from Burgos's person.

- On April 3, 2019, Melendez directed the delivery of approximately 400 grams of cocaine by Antoine Mack to Carlos Richards in Manchester, New Hampshire. Melendez coordinated the sale of the cocaine and the delivery of the cash proceeds through a series of intercepted telephone calls and text messages (Exhibits 32, 33, 35, 36, 116, 117, 118). ATF Special Agent Anthony DiPaola testified regarding his surveillance of the meeting between Mack and Richards in Manchester, and Mack's delivery of the cash proceeds to Melendez at 26 Malvern was depicted on pole camera video, and in Mack's own Snapchat photo (Exhibits 173-2 and 173-3, and 120).

- On April 12, 2019, Melendez purchased approximately 500 grams of cocaine from Angel Cordova at the intersection of Plantation and Hamilton streets in Worcester. The jury heard a series of calls between Melendez and Cordova arranging that sale (Exhibits 38-45). Worcester Police Detective Thomas Duffy testified regarding his surveillance of the meeting between Melendez and Cordova that evening.

---

[4] The government files this omnibus opposition without the benefit of trial transcripts. The evidence detailed below is drawn from the physical exhibits, notes taken during trial, as well as the undersigned AUSA's best memory of the testimony.

- On April 22, 2019, Melendez directed the delivery of approximately 400 grams of cocaine by Antoine Mack to Carlos Richards in Manchester, New Hampshire. Melendez coordinated the sale of the cocaine and the delivery of the cash proceeds through a series of intercepted telephone calls and text messages (Exhibits 49-57). Massachusetts States Trooper Kenneth Lombardi testified regarding the initial stop of Mack on April 22, 2019, and Special Agent DiPaola testified regarding his surveillance of Mack in Manchester later that evening. Worcester Police Detective Peter Roberge testified regarding his surveillance of Mack at 531 Main Street for the purpose of delivering the drug proceeds to Melendez.

- On April 27, 2019, Melendez purchased at least 700 grams of cocaine from Angel Cordova on Perry Avenue in Worcester. The jury heard a series of calls between Melendez and Cordova arranging that sale (Exhibits 59-63). Worcester Police Officers Stephen Mitchell and Brendan Tivnan testified regarding their surveillance of the meeting between Melendez and Cordova that evening.

- On May 6, 2019, Melendez coordinated the purchase of approximately 500 grams of cocaine from Angel Cordova at 69 Cutler Street in Worcester. The jury heard a series of calls between Melendez, Cordova, and Kevin Jean arranging that purchase (Exhibits 67-72). Worcester Police Officer Michael Ryder testified regarding his surveillance of the Cordova cocaine delivery to 69 Cutler Street that evening.

- On May 8, 2019, Melendez directed the delivery of approximately 400 grams of cocaine by Kevin Jean to Carlos Richards in Manchester, New Hampshire. Melendez coordinated the sale of the cocaine through a series of intercepted telephone calls on May 7 and May 8 (Exhibits 73-76).

- On May 17, 2019, Melendez purchased 531 grams of cocaine from Angel Cordova at 26 Malvern Road in Worcester. The government presented a series of phone calls and text messages between Melendez and Cordova arranging that sale (Exhibits 78-85, 130), and the meeting between Melendez and Cordova at 26 Malvern Road was captured on pole camera video (Exhibits 131-3 and 131-4).

- On May 25, 2019, Melendez purchased approximately 300 grams of cocaine from Angel Cordova at 151 Hartford Turnpike in Shrewsbury. The government presented a series of phone calls and a text message between Melendez and Cordova arranging that sale (Exhibits 90-93, 132), and the meeting between Melendez and Cordova at 151 Hartford Turnpike was captured on pole camera video (Exhibit 133).

- On May 25, 2019, Melendez distributed approximately 300 grams of cocaine to Carlos Richards at 151 Hartford Turnpike in Shrewsbury. The government presented a series of phone calls between Melendez and Richards arranging that sale (Exhibits

97, 99), and the meeting between Melendez and Richards at 151 Hartford Turnpike was captured on pole camera video (Exhibit 133). Worcester Police Officers Pat Gallagher and George Adams testified regarding their physical surveillance of Richards after he left Melendez's trailer and proceeded into New Hampshire. New Hampshire State Trooper Timothy Berky testified regarding his stop of Richards and his search of the Honda. During that search, Berky located and seized over 200 grams of powder cocaine and over 100 grams of crack cocaine from the trunk of the car (Exhibits 134-136).

Presented with that evidence – taken in the light most favorable to the government and when considered as a whole – it would be surprising if the jury did not find Melendez guilty beyond a reasonable doubt. *Scott,* 564 F.3d at 39.

    D.    <u>Juan Rodriguez's Myriad of Claims Fail</u>

In his motion for judgment of acquittal, Rodriguez incorporates by reference those arguments that he made in his filing made at the close of the government's case-in-chief (ECF #489), which the Court denied on April 5, 2022. In that prior filing, Rodriguez argued that the jury heard insufficient evidence of his participation in the charged conspiracy, that the government failed to present sufficient evidence to "convict Rodriguez of more than 500 grams," and that some form of variance of the crime charged versus the crime(s) proven occurred. In his most recent filing, Rodriguez adds the claim that the Court erred by failing to give a specific quantity instruction and by failing to require that the jury attribute a specific quantity to Rodriguez beyond a reasonable doubt. Each of these arguments fails for the reasons detailed below.

    *1.*    *The Jury Heard Sufficient Evidence Regarding Rodriguez's Participation in the Conspiracy*

In his motion, Rodriguez either minimizes or wholly disregards the evidence introduced at trial regarding his role in the cocaine trafficking conspiracy. Rodriguez implores this Court to ignore its mandate to "evaluate the sum of all the evidence and inferences drawn therefrom in the

light most favorable to the government," *Acevedo-Hernandez,* 898 F.3d at 161, and, instead, to substitute the jury's interpretation of the evidence with that offered by Rodriguez. Specifically, Rodriguez asks the Court to infer that Rodriguez and Melendez were engaged in a marijuana conspiracy based on one or two calls intercepted during the wiretap. The Court should not and cannot "reweigh evidence or make credibility determinations anew." *Burks,* 437 U.S. at 16.

With respect to the evidence presented at trial, the jury heard:

- Rodriguez's family owned 69 Cutler Street during the relevant timeframe, the epicenter of the cocaine trafficking organization. Rodriguez lived in the second/third floor apartment at 69 Cutler.

- On March 14, 2019, during an intercepted phone call, Rodriguez informed Melendez that he had obtained almost a kilogram of cocaine ("I got almost the whole thing too, bro.") (Exhibit 21). Melendez indicated that was good because he expected their primary cocaine buyer, Carlos Richards, to be in Worcester the following day ("Okay, good. Lito will be through tomorrow").

- On March 24, 2019, during an intercepted phone call, Melendez asked Rodriguez to cook powder cocaine into crack cocaine ("Can you do one up?") (Exhibit 26). Approximately one hour later, Rodriguez called Melendez to inform him that the crack cocaine weighed 120 grams but that it would likely end up being less because the "shit was still damp" (Exhibit 27).

- On April 3, 2019, after Lujan Burgos was arrested with over 20 grams of cocaine that he obtained from Melendez, Rodriguez called Melendez and asked Melendez to contribute $3,000 to post Burgos's bail (Exhibit 34). Melendez agreed; he later called Rodriguez and confirmed that he had the requested $3,000 after Antoine Mack delivered the cash proceeds from the cocaine sale to Richards (Exhibit 37).

- On April 22, 2019, Antoine Mack went to 69 Cutler, "Mula's spot," to pick-up approximately 400 grams of cocaine to deliver to Carlos Richards (Exhibits 49-50). Massachusetts State Police Trooper Ken Lombardi testified that he stopped Mack as he drove on Route 495 North towards Manchester. Mack successfully concealed the cocaine from Trooper Lombardi, who dropped Mack off at a gas station in Boxborough (Exhibits 122, 124-1 and 124-2). While there, Mack called and texted Rodriguez over 25 times (Exhibit 3). Later that night, Mack used Rodriguez's Nissan Altima to deliver the cocaine to Richards in Manchester and to deliver the drug proceeds to Melendez at 531 Main Street (Testimony of Special Agent DiPaola and Detective Roberge, Exhibits 53-57).

- On May 8, 2019, Rodriguez gave Kevin Jean his Nissan Altima to use to deliver 400 grams of cocaine to Carlos Richards in Manchester (Exhibits 73-76). WPD Detective Pat Gallagher testified that he observed Rodriguez's Altima leave 69 Cutler Street to deliver that cocaine.

- On May 15, 2019, Nathan Lacey called Rodriguez and asked Rodriguez if he had cooked any powder cocaine into crack cocaine ("did you do any chefin'?") (Exhibit 103). Rodriguez confirmed that he had ("Yeah, everything good") and that he would be available to meet Lacey at 69 Cutler Street ("Alright, I'll be back at the crib probably in half an hour").

- On May 20. Melendez learned that Rodriguez had been arrested on an unrelated warrant and could potentially be held (and therefore away from 69 Cutler Street) for up to 90 days (Exhibit 87). Melendez immediately called Rodriguez's father, concerned that persons with access to 69 Cutler would steal the assets of the cocaine conspiracy without Rodriguez there to protect those assets ("I'm not gonna take it out of there but I was gonna switch locations") (Exhibit 88).

- On June 5, 2019, agents executing the search warrant at 69 Cutler located numerous items reflecting Rodriguez's residence in the second/third floor apartment (Exhibit 154). In Burgos's bedroom, agents seized paperwork in Rodriguez's name and over 50 grams of cocaine (Exhibits 155-156, 167-168, 170). Agents also located and/or seized numerous digital scales scattered throughout the common areas of the apartment (Testimony of Special Agent DiPaola, Exhibits 157-158, 163-166).

That evidence, viewed in the light most favorable to the government and when considered as a whole with all plausible inferences drawn therefrom, demonstrated that Rodriguez conspired with Melendez, Jean, Antoine Mack and others to: (1) acquire cocaine on behalf of the drug trafficking organization; (2) cook powder cocaine into crack cocaine for distribution to the organization's customers; (3) store and protect the cocaine at 69 Cutler Street; (4) provide use of 69 Cutler Street to distribute cocaine; and (5) provide transportation for Antoine Mack and Kevin Jean to deliver cocaine to the primary buyer of the drug trafficking organization. The evidence was clearly sufficient to support the jury's guilty verdict in this matter. *Appalon,* 695 F.3d at 55 ("The verdict must stand unless the evidence is so scant that a

rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt.").

        2.       *The Conspiracy in Which Rodriguez Participated Involved 500 Grams or More of Cocaine*

Throughout his filings, Rodriguez conflates the burden on the government with respect to the offense contained in the Indictment. More specifically, Rodriguez was charged – and was subsequently convicted – with entering into an agreement with one or more persons to possess with the intent to distribute or to distribute cocaine. Further, it was charged that the conspiracy that Rodriguez joined involved 500 grams or more of cocaine. Notably, Rodriguez (unlike Melendez) was not charged with personally being responsible for 500 grams or more of cocaine, and therefore the jury did not "convict Rodriguez of more than 500 grams" as suggested by Rodriguez in his initial filing. Instead, the jury was required to make a specific finding – beyond a reasonable doubt – that the conspiracy in which Rodriguez participated involved more than 500 grams or more of cocaine, as that fact increases the maximum penalty that Rodriguez is exposed by statute from 20 years to 40 years. *United States v. Alleyne*, 530 U.S. 466 (2000).

No more was required. Any argument that Rodriguez makes that the Court erred by "failing to give a specific quantity instruction to the jury and by failing to require them to attribute a specific quantity to Rodriguez" fails as a matter of law. As the First Circuit emphasized:

> It is firmly settled that the standard of proof for judicial factfinding at sentencing is preponderance of the evidence, so long as the factfinding does not "increase the penalty for a crime beyond the prescribed statutory maximum…. The district court's drug quantity finding merely increased [defendant's] base offense level under the Guidelines, and his ultimate sentence of 78 months on each count was well below the applicable statutory maximums….Neither *Apprendi v. New Jersey*, 530 U.S. 466 (2000), nor *Alleyne* is implicated by judicial factfinding that has no effect on the range of punishment authorized by statute.

*United States v. Jean-Baptiste*, 663 Fed. Appx. 7, 9 (1st Cir. 2017) (citations omitted).

      3.      *There Was No Variance of Proof at Trial*

Rodriguez additionally argues:

> At best, the Government has shown some limited evidence of several conspiracies involving less than 500 grams by codefendant Carlos Richards in the State of New Hampshire and unindicted coconspirator in Massachusetts. There is no proven relationship between either of those conspiracies and Rodriguez. Indeed, Burgos was charged by himself in both cases in Massachusetts state courts.

Rodriguez Motion for Acquittal, ECF #489 at 10.

It is unclear what "variance" Rodriguez claims occurred at trial. Carlos Richards was a named co-conspirator in the Count One of the Indictment. It is not relevant that Richards lived in New Hampshire or that the actual distribution of the cocaine, on at least three occasions, occurred outside of Massachusetts. *See, e.g., United States v. Uribe*, 890 F.2d 554, 558 (1st Cir. 1989)(finding it "clear beyond peradventure" that venue proper so long as any act in furtherance of conspiracy was committed in district, even if drug conspirator was not physically present there).

Moreover, as detailed in its August 2019 automatic discovery correspondence, the government specifically identified Lujan Burgos as an unindicted co-conspirator. That Lujan Burgos was charged in Massachusetts state court with his possession of cocaine is also not relevant to his participation in the conspiracy with Rodriguez and the other defendants. *See, e.g., United States v. George*, 752 F.2d 749, 756 (1st Cir. 1985) (conviction for conspiracy to distribute methamphetamine in Massachusetts does not constitute double jeopardy despite fact that defendant previously convicted in Pennsylvania for attempt to distribute methamphetamine).

E.  Kevin Jean's Assertions Regarding the Sufficiency of Evidence and Other Grounds Fail

For his part, Kevin Jean filed a post-trial motion (and supplemental motions) for acquittal (ECF # 511, 513, 517).  In those submissions, Jean argues that the evidence presented against him was insufficient for a reasonable jury to find him guilty and that the grand jury – in July 2019 – was misled regarding the evidence against him.  For the reasons detailed below, the Court should deny Jean's claims.

1.  *The Jury Heard Sufficient Evidence Regarding Jean's Participation in the Conspiracy*

The evidence against Jean presented at trial largely revolved around a three-day period from May 6, 2019 through May 8, 2019.  First, the jury heard evidence that on May 6, 2019:

- Melendez contacted Angel Cordova and coordinated delivery of a half kilogram of cocaine to Melendez at 69 Cutler Street (Exhibits 67-69).

- At approximately 7:49 pm, WPD Officer Michael Ryder testified that he observed Melendez's Jaguar SUV drive from Anytime Fitness to 69 Cutler Street.

- At 8:29 pm, Melendez informed Cordova that he needed to go to the mall to purchase a t-shirt, and that he would have someone retrieve the cocaine from Cordova on his behalf ("I'm gonna have my man… he'll run down to you, ok.") (Exhibit 70).

- At approximately 8:34, Officer Ryder observed the Melendez Jaguar leave the area of 69 Cutler Street.

- At 8:40 pm, Melendez confirmed with Cordova that Melendez would send down the "white kid" to retrieve the cocaine.  (Exhibit 71).  Kevin Jean matches that description.

- Seconds later, Melendez called Jean and informed Jean that Cordova was on Cutler Street in a gray Dodge Charger (Exhibit 72).

- At approximately 8:41 pm, Officer Ryder observed an individual exit 69 Cutler Street, approach the Dodge Charger for 1-2 minutes, and then return to 69 Cutler.  Cordova in the Charger left the area of 69 Cutler seconds later.

Based on that series of intercepted phone calls and Officer Ryder's observations, a reasonable jury could find that Jean conspired with Melendez to acquire 500 grams of cocaine from Angel Cordova that evening. This remains true even if the jury did not determine that Jean was the individual who actually went down to retrieve the cocaine from Cordova, because the calls support the rational finding that Jean was involved in the cocaine delivery (and therefore was a member of the cocaine conspiracy) that night. Whether Jean served as the dispatcher – taking instructions from Melendez and directing an unknown third party to retrieve the drugs – or actually retrieved the drugs himself, Jean was a willing and voluntary participant in this drug transaction.

The jury also heard additional evidence regarding Jean's active role in the cocaine distribution conspiracy just two days later. Specifically:

- On May 7, 2019, Melendez called Carlos Richards and informed him that he had 400 grams of cocaine for Richards ("[T]here's four there for you") (Exhibit 73). The two men agreed that Melendez would deliver the cocaine the following day.

- On May 8, 2019, at 12:06 pm, Melendez called Cordova and confirmed that he would be heading to Manchester soon.

- On May 8, 2019, WPD Detective Pat Gallagher conducted surveillance at 69 Cutler Street. At approximately 12:44 pm, Detective Gallagher observed Melendez's Jaguar parked at 69 Cutler.

- At approximately 2:23 pm, Detective Gallagher observed Melendez's Jaguar back out of the driveway, thereby allowing Rodriguez's Altima to exit the driveway and drive from the area. Melendez's Jaguar pulled back into the driveway and Melendez went back inside the house at 69 Cutler Street.

- At 3:23 pm, Jean exchanged a series of text messages with Carlos Richards, first identifying himself as one of Junior Melendez's people and informing Richards that he was 30 minutes away (Exhibit 172). Jean requested the address for the two men to meet, and Richards provided his home address of 70 Notre Dame Avenue, Manchester, New Hampshire.

- At 3:56, Jean texted Richards and informed Richards that he was 5 minutes away (Exhibit 172).

- At 4:45 pm, Kevin Jean informed Melendez that everything was good, although he "had a little scary moment for like four exits." (Exhibit 75). In a subsequent phone call, Melendez and Jean confirmed that Jean was operating Rodriguez's vehicle ("[H]e needs the bag, the baseball bag out of the car") (Exhibit 76).

Based on that series of intercepted calls, text messages and physical surveillance – viewed in the light most favorable to the government and when considered as a whole with all plausible inferences drawn therefrom—the jury was well-warranted in finding that Jean delivered 400 grams of cocaine at Melendez's direction to Carlos Richards. The jury could also have reasonably inferred that Jean's delivery of 400 grams of cocaine on May 8 was the direct result of his retrieving that cocaine from Cordova just two days earlier, as detailed above. From all of this, any jury could rationally conclude that Jean was an active participant in this drug trafficking conspiracy. *See, e.g., United States v. Sepulveda*, 15 F.3d 1161, 1173 (1st Cir. 1993) (in a drug trafficking conspiracy, "culpability may be constant though responsibilities are divided; the government does not need to show as a precursor to a finding of guilt that a given defendant took part in all aspects of the conspiracy.").

    2.    *Jean's Argument Regarding the Grand Jury Presentation is Without Merit*

Finally, in his last submission, Jean asserts that his conviction should be overturned because of allegedly misleading evidence presented at the grand jury. In support of that argument, Jean advances two claims:

(a) Special Agent Ventetuolo testified at grand jury that, on May 6, 2019, surveillance officers observed "a white male" exit 69 Cutler and interact with the gray Dodge Charger, whereas at trial Officer Ryder testified at trial that he observed "an individual" exit 69 Cutler and approach the Charger; and

(b) Special Agent Ventetuolo testified at grand jury that, on May 8, 2019, investigators monitoring a camera in the area of 105 Hamilton Street (i.e. Jean's residence) observed a white male exit the Altima, enter 105 Hamilton Street for a very brief period of time, then return to the Altima carrying a bag. At trial, the government presented no evidence of the video.

First, before even addressing the substance of Jean's claims, the First Circuit has made clear that to succeed on such a claim would be "hen's teeth" rare:

> [T]he Supreme Court has not defined the circumstances in which impropriety involving even a federal grand jury can ever lead to dismissal of an indictment once a petit jury has returned a verdict of guilt…. But those circumstances, as this court recently noted, are "very rare," even when there has not been a petit jury verdict of conviction-and all the more so when there has. *In re United States,* 441 F.3d 44, 60 (1st Cir.2006). The circumstances justifying dismissal of the indictment after conviction must be so severe, the prosecutorial misconduct so "blatant," as to "call[ ] into doubt the fundamental fairness of the judicial process." *United States v. Ortiz de Jesus,* 230 F.3d 1, 4 (1st Cir. 2000); *see also United States v. Reyes–Echevarria,* 345 F.3d 1, 4–5 (1st Cir. 2003).

*Goodrich v. Hall*, 448 F.3d 45, 49-50 (1st Cir. 2006) (denying motion for dismissal where defendant convicted after trial and jury unaware of allegedly improper grand jury testimony); *see also Geronimo-Martinez v. Medeiros*, 2018 WL 3849859 (D. Mass. 2018, Casper, J.) (denying 2255 motion where no indication that defendant was indicted solely because of, or that trial jury was aware of, alleged improper grand jury testimony). Based on that standard, Jean's argument clearly fails.

As to the substance of Jean's argument, Jean had all of the information available to him at the time of trial and the opportunity to cross-examine Special Agent Ventetuolo, Officer Ryder, and Special Agent John McKee (who authored the ATF Report of Investigation regarding the May 6, 2019 surveillance observations) about any alleged inconsistencies.

Similarly, on February 4, 2022, the government advised stand-by counsel for Jean that the camera that was installed in the area of 105 Hamilton Street on May 8, 2019 was owned by Worcester Police and had been recommissioned for use in an unrelated investigation in or about July 2019. The government further informed Jean's stand-by counsel that no recordings were preserved from that camera. Jean had that information available to him at the time of trial and had the opportunity to cross-examine Special Agent Ventetuolo regarding the loss of that video.

Additionally, Jean actually benefitted from the loss of that video footage, as that video would have been further evidence of Jean's use of Rodriguez's Nissan Altima to deliver cocaine to Carlos Richards on May 8, 2019. In short, there is nothing to "call into doubt the fundamental fairness of the judicial process." For that reason, Jean's claims must fail.

*   *   *   *   *

WHEREFORE, for the reasons detailed above, the Court should deny the post-trial motions for acquittal filed by each defendant.

        Respectfully submitted,

        RACHAEL S. ROLLINS
        United States Attorney

By:    */s/ Greg A. Friedholm*
        GREG A. FRIEDHOLM
        LAUREN A. GRABER
        Assistant United States Attorneys
        United States Attorney's Office
        595 Main Street
        Worcester, Massachusetts 01608

Date:  April 25, 2022

CERTIFICATE OF SERVICE

      This is to certify that I have served counsel of record for the Defendants a copy of the foregoing document by ECF and have mailed a hard copy of this document to pro se defendant Kevin Jean.

                                            */s/ Greg A. Friedholm*
                                            GREG A. FRIEDHOLM
                                            Assistant U.S. Attorney

Date:  April 25, 2022